UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jessica Syfko,

      Plaintiff,

v.

                                      **MEMORANDUM OPINION
AND ORDER**
Civil No. 12-314

Encompass Indemnity Co.,

      Defendant.

_____

      Patrick T. Tierney, Collins, Buckley, Sauntry & Haugh, P.L.L.P., Counsel for Plaintiff.

      Brian A. Wood and Christopher L. Goodman, Lind, Jensen, Sullivan & Peterson, P.A., Counsel for Defendant.

_____

## I.    Introduction

This is an action for breach of an insurance contract that arises from property damage to the basement of Plaintiff's home from a broken drain pipe. Defendant Encompass Indemnity Co. ("Encompass") insured Plaintiff's residence under a homeowner's policy, and Plaintiff submitted a claim with regard to the damage to her basement. Encompass denied the claim on the basis that the alleged damage fell within certain coverage exclusions.

## II. Background

### A. Damage to Property

On or about May 10, 2011, Plaintiff returned to her home and noticed a bad smell coming from her basement. (Goodman Aff., Ex. A (Plaintiff Dep. at 17).) She went down to the basement, and noticed black mold on the basement floor and corners of the walls, near the basement bathroom. (Id. at 33-34.) Plaintiff immediately left the home and called her mother, Susan Anderson. (Id. at 19.) Anderson then called contractor Tim Morris and asked him to investigate the source of the mold. (Id.) Anderson and Morris went to the home and examined Plaintiff's basement and discovered water under the subfloor in the basement. (Tierney Aff., Ex. C (Anderson Dep. at 30).) Thereafter, Anderson made a claim with the insurance provider, Encompass. (Id.)

On or about May 20, 2011, Anderson and Morris met with Rick Gehrmann, an adjuster for Encompass. (Goodman Aff., Ex. C (Anderson Dep. at 43); Ex. D (Morris Dep. at 33).) Gehrmann took a number of photographs of the basement, and asked Morris if he knew the origin and cause of the water damage. (Id. Ex. D (Morris Dep. at 33).) Gehrmann then told Morris that Encompass would pay Morris to determine the source of the damage. (Id., Ex. C (Anderson Dep. at 44);

Tierney Aff., Ex. B (Morris Dep. at 39).)

In a letter dated May 24, 2011, Gehrmann notified Plaintiff that Encompass was reserving its rights under the Policy to assert any and all policy defenses. (Tierney Aff., Ex. E.)  Gehrmann further notified Plaintiff of her duty under the Policy to protect the property from further harm by making all necessary repairs and to keep an accurate record of repair expenses.  (Id.)  The letter further notified Plaintiff of certain exclusions contained in the Policy, such as losses caused by water damage, and for damage caused by a continuous seepage from plumbing, and mold damage caused by continuous or repeated seepage or leakage from plumbing.  (Id.)  A similar letter was sent, dated June 2, 2011. (Second Goodman Aff., Ex. M.)

Between May 20, 2011 and August or September 2011, Plaintiff did not return to the home to pick up her mail.  (Goodman Aff., Ex. A (Plaintiff Dep. at 40-43).)  Plaintiff does not recall receiving any correspondence from Encompass about the claim.  (Id. at 43.)  Plaintiff discussed her claim with her insurance agent, Tom Fierst, on one occasion but did not talk with anyone associated with Encompass.  (Id. at 21-22.)  In fact, Plaintiff admitted that she has no knowledge

of the work done to her home because her mother handled the claim[1]. (Id. at 47.)

There was a lapse, however, between the time the claim was filed and the time

Plaintiff provided Encompass the written authorization necessary to allow

Encompass agents to discuss the claim with her mother. (Id. Ex. H.)

Encompass asserts that neither Plaintiff or Anderson responded to any of

Encompass' requests to re-enter the home and investigate the claim until after

Morris had taken down all of the basement walls and flooring.  Anderson

contends that she did call Gehrmann numerous times, but that he did not return

her calls.  Anderson asserts that she then called Brian Brady, Gehrmann's

supervisor, on June 1, 2011, because she felt nothing was happening with the

claim.  (Id. Ex. C (Anderson Dep. at 63; Tierney Aff. Ex. D (Brady Dep. at 34).)

Brady asserts that he immediately returned her call, and the two discussed hiring

American Leak Detection ("ALD") to determine the source of the leak.  (Tierney

Aff., Ex. D (Brady Dep. at 35).)  Anderson confirmed to Brady that at that time, no

demolition had been done, but that she did not want to use ALD, that she would

rather hire someone of her choosing.  (Id.)  Brady stated that that was her option,

_____

[1]Anderson purchased the home for her daughters' use in 2003 while they were in college.  In 2007, Anderson transferred ownership of the home to Plaintiff, but Anderson continued to pay the house payment.  (Tierney Aff., Ex. B (Anderson Dep. 9-14).)

but because she had not moved forward on determining the source of the leak, Encompass was going to send out ALD to determine the cause of the water damage. (Id. at 35-36.) Brady told her they would be contacting her within 24 hours to set up an appointment time at her convenience. (Id. at 36.)

Anderson, on the other hand, claims that she told Brady during this conversation that her contractor had already discovered the cause of the leak. (Goodman Aff., Ex. C (Anderson Dep. at 63).)

Between June 2 and 20, 2011, Tracy Eakins with ALD made numerous efforts to contact Anderson on Encompass' behalf to schedule a time to inspect the water damage. (Affidavit of Tracy Eakins, ¶¶ 8 - 12.) ALD's calls were never returned by Plaintiff or Anderson. (Id. ¶ 13.)

In a letter dated June 15, 2011 to Plaintiff, Glenn Webster notified Plaintiff that he was assigned to investigate her claim concerning water in her basement. (Tierney Aff., Ex. G.)

In the meantime, Morris tore up the floor in the bathroom and discovered the cause of the water leak - a break in the drainpipe from the basement shower. (Tierney Aff., Ex. B (Morris Dep. at 39, 41); Goodman Aff., Ex. D (Morris Dep. at 43, 45).) It was Morris's opinion that the plumbing in the basement appeared to

be from the original construction of the home in 1919. (Goodman Aff., Ex. D (Morris Dep. at 43-44).) Morris could not opine as to the cause of the crack, but believed "it certainly didn't burst I don't think." (Id. at 44.) Once he determined the cause of the leak, he took photographs of the damaged pipe and sent them to Gehrmann and Anderson and also spoke with Anderson.[2] (Tierney Aff., Ex. B (Morris Dep. at 41-42).) Morris testified that he never heard back from Gehrmann after he sent the photographs. (Id. at 42.)

On June 20, 2011, Anderson called Brady and informed him that Morris had discovered the cause of the leak. (Goodman Aff., Ex. I (Brady Dep. at 56).) She further informed Brady that the basement had been gutted, and that Brady should call Morris to discuss the cause. (Id. at 57.) Brady did call Morris, who informed him the leak was coming from a drain pipe that connects to the shower base, and that every time somebody showered, there would be a leak. (Tierney Aff., Ex. D (Brady Dep. at 59).)

Thereafter, Morris sent Encompass a letter detailing the source of the leak, and that the water had leaked underneath the false wood floor, which created a

---

[2]These photographs have not been made a part of the record. Morris testified that he no longer has copies of these photographs. (Tierney Aff., Ex. B (Morris Dep. at 40).)

mold bed. (Goodman Aff., Ex. K.) He further indicated that the water damage

and resulting mold "ruined nearly 3/4 of the basement plywood false floor,

carpeting, drywall, walls, etc." (Id.) Morris also testified at his deposition that the

flow of water from the broken drain pipe was continuous or repeated every time

someone took a shower. (Id. Ex. D (Morris Dep. at 95).) Morris further testified

that the water could have been flowing from the crack for a month or two, if not

longer. (Id. at 58-59, 47-48.) The basement was thereafter demolished and all

damaged portions were disposed.

On August 18, 2011, Encompass sent Plaintiff a letter informing her that it

was denying coverage based on the policy exclusion that applies to damage

caused by water seepage and because Plaintiff had failed to cooperate with

Encompass to investigate the claim. (Tierney Aff., Ex. H.)

### B.     Policy Language

Pursuant to the relevant policy issued to Plaintiff, Encompass agreed to

cover any direct physical loss to property, with certain exclusions. For example,

the policy excludes from coverage "remediation" arising out of continuous or

repeated seepage or leakage of water over a period of weeks, months or years.

(Tierney Aff., Ex. A (Policy Amendment at § II (F)(11)(c).) "Remediation" is

defined in the policy as

> the reasonable and necessary treatment, removal or disposal of biological irritants, contaminants, or spores - including but not limited to, mold, fungus, wet rot, dry rot, or bacteria - required to repair or replace property covered under PROPERTY COVERAGE - HOME damaged by a covered period. Remediation includes payment for any reasonable increase in living expenses necessary for your household to maintain its normal standard of living if biological irritants, contaminants or spores make your residence premises uninhabitable.

(Id. at Policy Amendment § I (C).)

> The policy also excludes from coverage any loss

> Caused by continuous or repeated seepage over a period of weeks, months or years, of water, steam or fuel:

> (1)  From plumbing, heating, air conditioning or automatic fire protection system, or from within a domestic appliance; or
> (2)  From within or around any plumbing fixtures, including but not limited to shower stalls, shower baths, tub installations, sinks or other fixtures designed for use of water or steam.

(Id. at Policy Amendment § II (G)(9).)

Finally, as relevant to this matter, the policy voids coverage in the event the insured fails to fulfill her contractual duties to cooperate with Encompass in the investigation of a claim, including the duty to preserve samples of damaged and undamaged property for inspection, testing and analysis. (Id. at Policy at 14-15 of 23.) In addition, the policy required the insured to show the damaged

property as often as reasonably required and to provide Encompass with records

and documents reasonably related to the loss.  (Id. at 17.)

## III.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## IV.    Standard of Review

Minnesota law governs the interpretation of the policy at issue.  W3i

Mobile, LLC v. Westchester Fire Ins. Co., 632 F.3d 432, 436 (8th Cir. 2011).  Under

Minnesota law, general contract principles apply to insurance policies.  Id. (citing

Carlson v. Allstate Ins. Co., 749 N.W.2d 41, 45 (Minn. 2008)).  "The policy must be

read as a whole, and unambiguous language must be accorded its plain and ordinary meaning." SCSC Corp. v. Allied Mutual Ins. Co., 536 N.W.2d 305, 311 (Minn. 1995) (citing Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co., 383 N.W.2d 645, 652 (Minn.1986)). Any ambiguity is construed in favor of the insured. Lott v. State Farm Fire & Cas. Co., 541 N.W.2d 304, 307 (Minn. 1995).

"[T]he initial burden of proof is on the insured to establish a prima facie case of coverage." SCSC Corp., 536 N.W.2d at 311 (citing Boedigheimer v. Taylor, 287 Minn. 323, 329, 178 N.W.2d 610, 614 (1970)), overruled on other grounds by Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 919 (Minn. 2009)). When an insurer denies coverage pursuant to an exclusion listed in the policy, the burden is on the insurer to show the applicability of the exclusion. Id., at 313.

**V.     Analysis**

It is Encompass's position that the policy excludes coverage for Plaintiff's claim arising from water damage in her basement pursuant to those exclusions listed in § F(11)(c) and § G(9).

With respect to § F(11)(c), the policy excludes coverage for the cost to repair or replace property damaged by mold or wet rot caused by the "continuous or repeated seepage or leakage of water over a period of weeks,

months or years." Based on the letter from Morris, Plaintiff's contractor, the record is undisputed that the damage was caused by a crack at the connection to the bathroom shower base. (Goodman Aff., Ex. K.) "Every shower every day leaked underneath the false wood floor which created a mold bed. It ruined nearly 3/4 of the basement plywood false floor, carpeting, drywall, walls, etc." (Id.) Plaintiff did not preserve the cracked drain, nor does the record contain any photographs of the cracked drain. In addition, Plaintiff has provided no evidence which demonstrates that the walls and floors did not have to be removed and replaced in order to remediate the mold or wet rot that existed in the basement.

Plaintiff attempts to get around the mold remediation exclusion by arguing that Encompass cannot rely on said exclusion, as it was not listed in the denial letter sent to Plaintiff. In support, Plaintiff asserts that Minnesota has adopted the Uniform Claims Practices Act ("UCPA") Minn. Stat. § 72A.201. While conceding that the UCPA does not provide a private right of action, Plaintiff argues that it does establish standards for insurers and their agents, and requires them to identify the basis for denial of coverage in its letter of denial. Minn. Stat. § 72A.201, subd.4 (11).

This argument has no merit, however, as the Eighth Circuit has held that

pursuant to Minnesota law, "[e]stoppel may not be used to expand the scope of

coverage under an insurance contract." Northwest Airlines, Inc. v. Federal Ins.

Co., 32 F.3d 349, 357 (8th Cir 1994); see also TGA Dev., Inc. v. Northern Ins. Co. of

NY, 62 F.3d 1089, 1091 (8th Cir. 1995) (finding that the UCPA gives rise to

appropriate administrative remedies, not a private right of action, and "thus no

estoppel can be predicated on its violation."). In addition, in the denial letter,

Encompass specifically reserved the right to assert other rights or defenses in

future. (Tierney Aff., Ex. H.)

Plaintiff further argues that there was no remediation of any mold before

the contractor began repairing and replacing the damaged property. Rather, the

contractor simply removed the damaged walls and floors and cleaned the

basement. As noted previously, however, it is undisputed that mold and wet rot,

caused by a crack in the shower base, damaged the floor and walls in the

basement, requiring them to be completely removed. Plaintiff testified that when

she went into the basement on May 10, 2011, she saw black mold on the basement

floor and in the corners of the walls. (Goodman Aff. Ex. A (Plaintiff Dep. at 20-

21, 33-34).) Morris repeatedly testified that the damage in Plaintiff's basement

consisted of mold and rotten wood.  (Id. Ex. D (Morris Dep. at 62-63, 93-94).)

Based on these facts, the Court finds that removal of the damaged walls and

floors in Plaintiff's basement was remediation, as that term is defined in the

policy.

Accordingly, the Court finds that Encompass has met its burden of

demonstrating that the exclusion for mold remediation applies here, and the

Plaintiff's claim is not covered by the applicable policy.

In addition, the Court finds that Encompass has met its burden of

demonstrating that the exclusion set forth in § G(9) applies - which excludes

coverage for a loss caused by the continuous or repeated seepage over a period of

weeks, months or years, of water from "within or around any plumbing fixtures,

including but not limited to shower stalls, shower baths, tub installations, sinks

or other fixtures designed for use of water or steam."

Plaintiff attempts to avoid this exclusion by arguing that Encompass

cannot demonstrate that the loss was caused by a "seepage" rather than a leak.

Plaintiff first argues that the policy originally included language that

distinguishes between leakage and seepage.  Plaintiff further argues that water

escaping from a broken drain pipe is not "seeping" it is "leaking."  Pursuant to

the definitions provided by Plaintiff, "seep" is defined as "to flow or pass slowly through fine pores or small openings" and "leak" is defined as "to enter or escape through an opening usually by a fault or mistake." (Plaintiff Opp. Mem. at 21-22 (citing (Merriam-Webster.com. 2013, http://merriam-webster.com/dictionary Jan. 2013)).

Plaintiff's contractor did not preserve the cracked drain pipe and there are no pictures in the record of the cracked drain pipe. The record nonetheless supports a finding that the crack was small and that water flowed from the crack slowly, as it is undisputed that the crack went undetected for weeks and/or months, resulting in a mold bed throughout most of the basement, and was discovered only when the mold created an offensive odor. (Goodman Aff., Ex. D (Morris Dep. at 47-48 58-59); Ex. K.) Accordingly, the record supports a finding that the water "seeped" from the cracked drainpipe, triggering the exclusion set forth in § G(9).

Because the Court finds that the exclusions set forth in §§ F(11)(c) and G(9) apply, Encompass is entitled to summary judgment. The Court need not address whether or not Plaintiff cooperated in the investigation of the claim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Encompass Indemnity

Company's Motion for Summary Judgment [Doc. No. 10] is **GRANTED**.  This

matter is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Date:   July 31, 2013


<u>s/ Michael J. Davis</u>
Michael J. Davis
Chief Judge
United States District Court